[No. 3217.]

## C. H. Thomas v. The State.

1. Assault with Intent to Rape—Evidence.—In order to sustain a conviction for assault with intent to commit rape, the proof must show that the assault was committed with the specific intent to *rape*. No other intent will suffice. For instance, a conviction for such offense is not supported by proof that the accused assaulted a woman with the intent of having improper connection with her, without the use of force, nor without her consent.

2. Same—Burden of Proof—Charge of the Court.—See the opinion *in extenso* for a charge of the court which, though couched in the language of the Code, and correct in the abstract, is *held* error, inasmuch as its effect is to impose upon the defendant the burden of proving himself innocent of any unlawful intent to perpetrate any offense.

3. Same—Fact Case.—See the statement of the case for evidence *held* insufficient to support a verdict for assault to rape, inasmuch as it fails to establish the essential element of intent.

Appeal from the District Court of Anderson. Tried below before the Hon. J. J. Perkins.

The conviction in this case was for an assault with intent to commit rape upon the person of Ida Kreig, in Anderson county, on the first day of November, 1883. The penalty imposed was a term of five years in the penitentiary.

Ida Kreig was the first witness for the State. She testified, in substance, that she was a girl thirteen years of age. On the night of November 14, 1883, at about seven or eight o'clock, the witness and Henry Carswell, a little boy about eight years old, started down town, in the town of Palestine, Anderson county, to purchase some lace for the witness's sister, who was to be married on the next night. When the witness reached a point in the middle of the street about opposite a store kept by a Mrs. Nelson, the defendant approached the witness and the boy, coming out of Mrs. Nelson's store, with two bottles in his hands, resembling soda water bottles. He told witness and the boy to drink. The boy drank from one of the bottles. The witness took the other bottle in her hand, but did not drink. She gave it back to the defendant, and he put it in his pocket. The defendant took the witness's hand with his left hand when he gave

her the bottle. She expected him to release her hand when she returned the bottle to him. The defendant then told the witness that he would give her ten dollars if she would " give him some." Witness refused. Defendant then pulled the witness up to him and told her that he would give her a hundred dollars if she would consent; that he was a railroad man and had plenty of money. Witness again refused, telling the defendant, who was showing her money, that she did not want his money. The witness then succeeded in releasing both hands, and she and the boy ran off towards Mr. Harris's house, which stood on the street. The defendant pursued and caught the witness just as she reached Harris's fence. He pushed her up against the fence, and again proposed to pay her if she would consent to copulation. Witness and the boy went through Harris's gate on to his gallery to escape the defendant, and saw the defendant pass on down the street. Witness saw no one at Mrs. Nelson's store, or at Harris's house, though she saw a dim light in the latter building.

Witness and the boy remained on Harris's gallery some minutes, until they thought that the defendant had gone. They looked around for him, and, not seeing him, came out and started along a road that ran diagonally through the space where the stock yards were once located. At this point the road intersected a street which led into town. When they had crossed the street and started across the stock pen, the witness looked around and saw the defendant as he rose up from the ground at the corner of Harris's fence. The defendant started in pursuit, running at his best, and the witness and the boy ran, screaming, and still pursued by the defendant, until they encountered Mr. Whittle on the road intersecting the street near Mrs. Potts's. Defendant pursued until he came within eight or ten feet of witness, the boy and Mr. Whittle, when, seeing Whittle on horseback with a gun, the defendant turned and ran in another direction. About this time, the witness's step-father, Mr. Warner, came up with a basket containing purchases, and asked what was the matter. On being told, Warner sat his basket down and ran after the defendant. Witness saw the defendant again that night. He was the same man she saw at Mrs. Nelson's store, the same man who pursued her, the same man who was now on trial. She had never seen that man before that night.

Witness did not cry out or give any alarm in the street near Mrs. Nelson's store. She saw a light in that store, but saw no

person in it.  She gave no alarm at Harris's.  She saw no person at Harris's.  She did not give any alarm until she was pursued the last time by the defendant.  She gave no reason for not doing so, though she was asked by counsel.  The defendant did not throw her down at Harris's fence, nor did he lift up her clothes.  He only put his hand on her as she ran.  The witness said that she knew what the defendant meant when he asked her to "give him some," but declined to answer how she knew.

Henry Carswell testified, for the State, that he was eight years old.  Ida Kreig came to the house where the witness lived on the night of the alleged offense, and asked him to go with her to town, and the two went together.  They saw the defendant in the street near Mrs. Nelson's store.  He is the same man who pursued witness and Ida across the stock pen grounds.

J. C. Whittle was the next witness for the State.  He testified that he had been hunting on the day of the alleged assault, and left the duck pond, about eight miles distant from Palestine, near dusk.  He rode in quite a brisk walk until he reached the suburbs of town when he checked up to a slow walk.  Witness reached the stock pen grounds at the point where the road crossing it diagonally intersects the street which runs north and south by Mrs. Potts's residence, between eight and nine o'clock.  As witness was crossing the stock pen grounds, and nearing the street last mentioned, he heard the voices of children screaming.  Supposing the parties to be children at play, the witness at first paid no attention to the screaming.  The voices coming nearer and nearer and sounding more like children in fright, the witness stopped his horse and turned in his saddle to see what was the matter.  Ida Kreig and Henry Carswell about that time came running and screaming toward the witness who was then holding his gun muzzle up, the breech resting on his thigh.  At the same time witness saw a man stop suddenly, and then run off rapidly in a northerly direction.  He had approached within ten, fifteen or twenty steps of the children.  The children appeared to be very much frightened, excited and nearly out of breath.  Witness asked Ida what was the matter and she replied that the man was after her.  About the same time Mr. Warner, Ida's step-father, came up, and being informed of the assault, and being directed to the man who was then running off, but in sight, he sat his basket on the ground, requested witness to stay with the children, and started in pursuit.  The witness went home with the children, and there saw the defendant in charge of a

policeman.  The witness had never seen the defendant before that night to know him, and could not swear that he was the same man he saw running after and off from the children a short time before.  The children caught up with witness about one hundred yards from where witness first heard them screaming.  The witness described the topography of the stock pen grounds.  Chas. Finger lived in a house about sixty feet east of Harris, and parties lived east and west of Finger.  The distance between Harris's house and Nelson's store is about one hundred yards.  There was a light in Nelson's store, and the door was open.  Witness did not remember that he saw anybody in the store as he passed it.  He did not see the children as he passed that store.  If the children were in Harris's yard or on the street near the house when the witness passed, they would have been too far to witness's left to be noticed unless they made a noise.  Witness heard no noise on the street and saw no other persons than the persons mentioned.

W. B. Warner was the last witness for the State.  He testified that he was the step-father of Ida Kreig.  He knew the defendant, C. H. Thomas.  Defendant was a married man, and in November, 1883, lived near the witness.  The witness heard the children screaming on the evening in question, and, thinking he recognized Ida's voice, went rapidly to the point from whence the sounds came.  He there found Ida, Henry Carswell and Mr. Whittle.  Asking what was the matter, Ida told him that a man was after her, and pointed out the retreating figure of a man.  Witness pursued instantly, keeping the man constantly in sight, until he overtook him after a chase of about two hundred yards.  The defendant was the same identical man who was pointed out to him by Ida Kreig as the man who had pursued her.  The State closed.

Lively Jowers, a colored woman, was the only witness introduced by the defense.  She testified that, crossing the stock pens on her way home from work, on the night in question, she heard children screaming, and turned and looked toward the point from where the screaming seemed to come.  She then saw Ida Kreig and Henry Carswell running and screaming.  At the same time she saw the defendant, whom she knew well, standing at the corner of Mr. Harris's fence.  He did not move while the witness was looking at him.  Thinking nothing was wrong, the witness started on.  She walked some distance before she looked back again.  When she did look back all the parties

were standing just as they were when witness first saw them. Defendant was then dressed in dark clothes and hat. He had two bottles, resembling soda water bottles, in his hands. It was a moonless but bright star light night. The witness and the defendant were about two hundred yards apart.

The motion for new trial presented, among other grounds, the issues discussed in the opinion.

*Gammage & Gregg* and *T. J. Williams,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. To authorize a conviction of the offense of assault with intent to rape, it devolves upon the State to prove satisfactorily such *specific intent.* That particular intent, no other, will make this offense. Thus an assault with intent to have an improper connection with a woman, but without the use of *force,* and not without the consent of the woman, would not be an assault with intent to rape. (*Pefferling* v. *The State,* 40 Texas, 486; *Curry* v. *The State,* 4 Texas Ct. App., 574.)

In explaining to the jury the law of assault and assault and battery, the learned judge in one paragraph of his charge says: "Any unlawful violence upon the person of another with intent to injure such person is a battery, and where violence is actually committed upon the person of another, no matter how slight, it rests with the person inflicting the injury to show the accident or innocent intention." This portion of the charge is assigned as error, and was made a ground of defendant's motion for new trial.

Whilst the paragraph is in almost the exact words of the Code (Penal Code, Art. 485), and in the abstract is unquestionably correct, still we think it was error to give it in this case. The burden was upon the State to show, beyond a reasonable doubt, that defendant committed the assault, and that he committed it with the specific intent of raping the person assaulted. He might have committed the assault and injury with some other intent than that of rape, and if so, certainly he could not be convicted of this offense because he failed to show that his other intention was an innocent one. Suppose he assaulted the girl with intent to *persuade* her to have carnal intercourse with him, but with no intent to *force* her to such carnal intercourse; he would not be guilty of an assault with intent to rape, and yet he

would be unable to show that he committed the assault with innocent intention. This charge instructed the jury that it devolved upon the defendant to show his innocent intention. His innocent intention of what? Of persuading, or of forcing the girl to have carnal intercourse with him? Considering the charge as a whole, we understand that it only devolved upon the defendant to show his innocent intention as to the rape in order to relieve him of this charge, but we very much doubt whether the jury so understood the charge. It is quite probable, we think, that they understood it to devolve upon the defendant the burden of proving an innocent intention of committing any offense or wrong upon the girl.

But, however it may have been understood by the jury, we think it was wrong to give it, because it shifted the burden of proof from the State to the defendant upon an issue, the affirmative of which the State was bound to prove beyond a reasonable doubt. There are instances where it is proper to thus shift the burden of proof, and where it would be proper to instruct the jury in this manner; but this case does not present such an instance. (*Jones* v. *The State*, 13 Texas Ct. App., 1; *Curry* v. *The State*, 4 Texas Ct. App., 574.) We think this error in the charge was calculated to mislead the jury to the prejudice of defendant's rights, and it is therefore such error as demands a reversal of the judgment. In all other respects the charge of the learned judge is a clear, forcible and correct exposition of the law of the case.

2. Considering the whole evidence as presented by the record, the case, to our minds, is a singular one, if the defendant's intention was to commit a rape. We think the evidence is unsatisfactory as to such being his intention. In view of the meagreness of the evidence tending to establish this specific intent, and of the alleged newly discovered evidence, we think the court should have granted defendant a new trial.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered June 14, 1884.